Good morning, Your Honors. David Landry on behalf of Daniel Carrera-Virula, the petitioner. Your Honors, this case comes to us primarily from the petitioner's position that the Board of Immigration Appeals order of March of 2006 was essentially outside their purview and that even if it is within their purview, in other words, even if it is within their ability to issue such an order, it's factually incorrect and legally incorrect and should be reversed. The Court issued an order requesting that the parties or ordering the parties to discuss the relevance of the Fernandez case, 619F31069. I've reviewed that case, and I don't think it's actually on point, Your Honors. Good. Then why don't you go to the substance of your argument? Yes, Your Honor. The substance of her argument is that when the Board reviewed the facts, what they call the facts of the case, they were working with an incomplete record. In fact, the Board, in its order, acknowledges that at some point during the removal proceedings, the IJ turned off the recording. So at this point, we have no idea what happened, at least according to the record. We have no idea what got discussed. Do we know how long the recorder was off? I don't know that there is any evidence in the record to show how long it was on and off. And what was going on at the time that the recorder was off? Well, Your Honor, I wasn't the attorney of record. Wait a minute. That's not a good answer. I mean, you're up here representing your client, and you're making an argument that there was a gap in the tape, and now you're telling us you don't know anything about it? Well, Your Honor, what I'm explaining to you, Your Honor, is that there is an acknowledged gap in the tape. And the BIA said it didn't find any defect that materially affects our ability to review the issues on appeal, unquote. Yes, Your Honor. What do we do with that? Well, Your Honor, I think that I don't understand how that's factually possible. How is it that the Board of Immigration Appeals, a reviewing court that's limited to the record of proceedings, can say there was a gap in the record of proceedings, but we find that whatever happened during that gap is not material to what went on? And what's the question? Well, do you have any offer of proof of what it was that's missing? I mean, are we missing the Petitioner's testimony? I mean, that would be perhaps more prejudicial than, I don't know, parts of his testimony or, I mean, direct, redirect. No, I understand. I understand, Your Honor. And you make a very good point. Unfortunately, our records don't tell us whether that gap in the record was relevant or not relevant to the proceedings. But did your client give you an indication of what he said during that gap, if anything, that would make a difference to the outcome? Well, I've asked my client that question, and unfortunately, he doesn't remember what exactly happened. And, of course, I think that's reasonable under the circumstances. A person that's not in court on a regular basis doesn't know to remember that type of thing. I think it's reasonable to understand that a person in that nervous situation and talking about events that happened to him, that he— Well, what we do know is he said that, I believe that if I should be removed, I would stay in the Capitol and not go back to my hometown where I was born. Question, okay. Well, would you be safe in the Capitol? Answer, I trust in God that it would be so. Well, if you return to Guatemala and stay in the Capitol, you think you'd be safe there? Then you probably don't have any claim for protection under withholding or torture convention if you can find a safe haven in your country. Probably yes. And is there anything in the missing part that disputes that? Well, that I don't know, Your Honor. But I would like to speak to that point, and I think Your Honor makes a very good point, that this, that colloquy would tend to suggest, I would agree, that perhaps there is a safe haven in Guatemala City. But those statements made by the Respondent were speculative. In fact, he doesn't say genuinely that he's sure that if he goes to live in Guatemala City, he clearly will be safe. He said he trusts in God. Well, he went back twice to visit his father. Is there anything in the missing part of the tape that might suggest that he didn't go back to visit his father twice? Not that I know of, Your Honor. And you're right to put that point out. However, the Respondent in his testimony also prefaces that with the understanding that he did so in a very short period of time. He did his best to stay, you could say, out of the limelight or outside of the general sight of other individuals. So he did his best to keep himself away from those that he knew. And when did the events that he's worried about happen? In 1981? That's correct, Your Honor. And that's the distance between now and 1981 is planetary. Well, Your Honor, I would agree with you if we were not talking about Guatemala. And even, although I haven't referenced even the current country reports, but certainly the country reports that the Board of Immigration Appeals reviewed at the time that they reversed the IJ's decision, the board even acknowledges in it that the government officials in Guatemala are continuing to do the same or similar things that they did when the Respondent fled. How would you articulate your best case for the proposition that if your client is sent back to Guatemala, he's maybe going to be tortured? Well, Your Honor. What's the evidence of that? The best evidence is that his prior persecution came at the hands of Guatemalan government officials. In 1981? Yes, Your Honor. And although I can't offer the documentary evidence, I know from dealing with other Guatemalans that, in fact, the current president of Guatemala was a former guerrilla. And there were a number of individuals that ran against this president that were murdered during the time period that he was running for president. Well, your client never ran against him or had anything personally to do with this. No, Your Honor. You're correct. But what I'm suggesting to Your Honors is that the current state in Guatemala still is dealing with lawlessness and is dealing with government officials that abuse their positions and work outside the law. And... So you're just saying that, generally speaking, it's not a nice place to be. And because my client got sideways in 1981, it's likely that that's what will happen to him again. And it's hard for me to understand why, if somebody is this terrified of going to Guatemala, that he would go back twice. Well, you're right, Your Honor. That is a logical... And now he says, probably, yeah, I can stay out of my old place and I'll be fine. Well, I would like... I understand. I don't think that's an accurate characterization of his statement. You read a very good quote, Your Honor, and in that quote he talks about trusting in God. He doesn't say, I think I'll be safe in Guatemala City because people are there or not there that won't harm me. So, but he doesn't... The regulation put the burden on him to show, more likely than not, that he would be tortured. What I'm hearing from you, we have to uphold the BIA if its conclusion is supported by substantial evidence. And what I'm hearing from you is, how can the BIA be sure? How can we be sure? But that's not really the standard, is it? Well, Your Honor, you're right as to the substantial evidence standard. And I think that's part and parcel to why it is that the board's decision was incorrect. Because the board seemed to read into the record, or actually, I'm going to rephrase that, the board acknowledges all these reasons why, in their order of 2006, the reasons why the respondent has proven his claim, so on and so forth, and essentially comes to the very end and says, but we don't find that there's enough evidence in the record to show that it's more likely than not he'll be tortured himself. The BIA relies on the length of time, 25 years ago, that the couple of visits to Guatemala didn't result in harm, and that your client could relocate as per his testimony. And so we would have to say that that wasn't substantial evidence supporting the BIA's conclusion. And what I'm hearing from you is not that it's not substantial evidence, but that there's evidence that would support an alternate conclusion. Well, then I misspoke. Because I don't think, I think that what the board did was that it took those statements out of context and attempted to create an argument simply from those few words that I think realistically they've misphrased. What do you mean out of context? They took them in context. Well, in that, Your Honor, much the way that you just quoted that quote from the respondent during his testimony, he's not saying clearly and definitively that Guatemala City is a safe haven for him. Where does he say, if I go back, I think I'm going to be tortured? Well, he says it, he says it throughout. I don't want to, I don't have the. But she, well, you know the problems with your own case. I do, Your Honor. It's not clear cut, but that's the point, Your Honor, is that when the board reviewed the record, they did not have the complete record. And essentially, and they make the argument, or they make the finding that. Is the complete, will anyone ever have the complete record? That's a good question. I would imagine no, Your Honor. I'm sorry. Go ahead. You're asking to start all over again. Well, I think, Your Honor, if it is that the board felt like there was not enough evidence in the record to decide whether or not the respondent would be tortured or killed, then the proper format would have been to remand it to the judge for further proceedings. Did you ask, did anybody ask that that happened? Well, Your Honor, if you look at the transcript of the proceedings, there actually were two hearings that happened on remand. Right. At the first hearing, an attorney, Mr. Sue, tells EIJ, the immigration judge, I haven't even been hired for this. But he appears because evidently, I guess he's at the court and he's doing the court of the respondent a favor. The respondent isn't delivered. His body isn't physically delivered. So they continue the hearing to the March 29th hearing where Mr. Sue does the hearing telephonically. And is that the one where he says he doesn't have any new evidence to offer? Your Honor, the question from the immigration judge is, Mr. Sue, anything further? Right. And he says? Your Honor, I'd like to reserve appeal. Period. I mean, there's no offer of anything. Well, you're correct, Your Honor. There is not an offer of anything. But when you read the board's remand order, it's, I think, any reasonable person reading that, and including the immigration judge, would say there's nothing else to talk about. Well, the remand is plenary under our law, and they can do anything they want so long as the BIA doesn't restrict the inquiry on remand. Well, that's what I think, in essence, that's what the board has done, is it has restricted it, because the board, in its order, doesn't say, the further order is, the record is remanded for the entry of an order of removal consistent with the foregoing opinion. It doesn't say, and for further proceedings, like there was in Fernandez. It doesn't, it didn't give the I.J. that opening. And I think that when the I.J. looked at this, and, of course, we're having to read into the circumstances here, but when you look at the, what the I.J. said and what Mr. Sue said on the record, at those two hearings, it's clear that the two of them were under the presumption that there was nothing else that could be done. Well, what could have been done, though? Well, I think more proper, a more proper order would be for the board to acknowledge that there was a hole in the evidence, and to remand it to the I.J. for further proceedings to address whatever it was that was missed in that evidence. And then allow the I.J. to reassess the evidence and issue a new order. By issuing an order limiting the I.J. to just issuing an order of removal, and that's, that is what the board's decision said, it limited the I.J. It essentially said to the I.J., you cannot do anything else other than issue an order of removal. Had there not been a gap in the record by your hypothesis, is there any reason the BIA couldn't have remanded to the I.J. simply to issue a removal order? Well, at the time that I filed my brief, we were relying upon the Camacho case. Which said the BIA had to have the I.J. issue the removal order. Yes, Your Honor. But is there any reason that that would have been inappropriate for the BIA to have a case law? I don't know of any case law that's in conflict with that. Okay, thanks. All right, thank you, counsel. May it please the court, Rebecca Hoffberg on behalf of the United States Attorney General. The only issue before this court is whether the record compels reversal of the board's denial of deferral of removal. I want to just address two preliminary issues that have arisen in your discussion with him. The first is about the gap in the transcript. That issue has not been exhausted. The only reason why it even came about is because the board itself noted the gap in the transcript. You asked opposing counsel what seems to be missing in the transcript. And the answer is that around page 212, this is where the gap occurs. Page 212 of the administrative record. And it's during testimony? It's during cross-examination. Cross-examination of? Of the Petitioner. And what happened is, after he finished his direct testimony, completed all of his direct testimony with respect to his claim, he was being asked mostly, it seems, about his criminal conviction, which this Court has now removed the issue from this case entirely. That was actually the line of questioning. What you see happens is How do you know that? When you see on the gap, I'll show you the record. Okay. As I mentioned, it's on page 212. And what you see is that at the end of it, he says, and do you remember the date that you were kidnapped in 1981? So they were asking about the past incident. Then you see on the record, off the record, comes back on, because the 29th of September 2001, I had sexual relations with her on the beach. Now, this is referring to his conviction for sexual abuse. So the question is not there, but the answer is? Is that what I heard you say? I'm sorry. The question is not there, but the answer is? Yes. Can you tell how long the gap is at all? No. You can't tell this. And the thing is, is that if he completed his direct testimony on his claim, and then you look at the IJ's decision, which summarizes the facts that were presented, there doesn't seem to be anything missing. I mean, whatever happened in cross-examination, that was actually going to be to the government's benefit to point out any holes in the story, and he couldn't have been harmed by that. The other thing is, he couldn't have been harmed by testimony relating to his criminal conviction, because this court has already decided that he is categorically an aggravated felon, and that testimony doesn't matter for this case. But the most important... Just on the gap thing, can you think of any legitimate reason why the tape recording would be turned off? I wish I could tell you. I just don't understand. I mean, generally, that's all we have to review. It's all the BIA has. We review these records extensively, and gaps bother us. It bothers us as well. The thing is, is that had he raised the issue to the board... Now, keep in mind... It's true. It was not raised the first time to the BIA. Twice it wasn't raised. Twice in this case. Because, as you remember, it went to the board, it wasn't raised. It went back to the IJ, and then it went to the board again, and he doesn't raise it. He raises it in his statement of facts. On his appeal to the board, his first appeal to the board not raised at all. The board is the one who points it out. The second appeal to the board, he mentions it in the statement of facts as a statement of fact. Yes, there's a gap in the transcript, as the board noted in his prior decision. But it wasn't identified as an issue. No. There's no argument to it. He's not arguing that there was... No, it's not enough that there's a gap. It has to be prejudicial. Right. There has to be a reason why we care that there's a gap. Right. And that's really hard, is when there's a gap, and we don't know what was in it because there was a gap, so we can't make the determination of whether it's prejudicial or not. I mean, the fact is, it's his burden to show that. Right. Have you ever heard of Rosemary Woods? No. You haven't? Google it. Oh, my goodness. You're so young.  Watergate. There's an 18-minute gap in the Richard Nixon tapes. Oh, yeah. I know what you're thinking. The most famous gap of American history. Yes. I sat through five days of argument once in the Ninth Circuit, and somebody didn't turn on the tape recorder. Well, I mean, the fact is... Which I didn't find out until we got back to Boise. Want to hear the arguments? Don't exist. Well, certainly they weren't aware. Had they known, they certainly wouldn't have let this go on, I can only imagine. But the thing is, in this case, this is the type of issue that has to be exhausted, because as you pointed out, what's the solution? Wait just one second, because doesn't our case law hold that if the BIA addresses an issue, whether it was raised by the petitioner or not, we deem it to be exhausted? Now, the BIA says there's a gap and says it wasn't prejudicial, so it seems to me that, at least from an exhaustion perspective, our case law would say that it is, and we could address that. Well, that's true, except in this case, remember, he didn't exhaust it again. So maybe the board revived the issue, then it went back and he had the chance to raise it, and then he didn't raise it. Well, one might think that if the board brought it up, that somebody might be alert enough to try to make something out of it, and nobody ever did. We still don't know what the prejudice might be from something like this. This is true, but again, I'd like to direct the Court's attention to the IJ's decision. It was clearly there, and the IJ knew what was said. Which IJ decision? Oh, I'm sorry. The one, the IJ decision that appears, it's around page 628, September 27th, 2005. It appears, it begins on page 625 of the record. And so basically, what you see in the IJ's decision is a summary of everything that was presented at the hearing. And it doesn't conflict with anything that we know to be included in the record. There's no information that you would question, well, we're not sure how the IJ came up with that because we don't know what's in the record. There was nothing raised about that, and there's nothing that indicates that. Even if you might be concerned, there's nothing that would give rise to that concern based on the IJ's decision. And I'd also like to remind the Court, he finished presenting his case. It was the government's cross-examination. And this much is clear because you see where it leaves off and where it picks up, it's still on a cross-examination. So if anything, this would have been helpful to the government to see the cross-examination, not to him. So I just wanted to point that out as well. The other issue is a preliminary issue that I wanted to address in terms of this. And by the way, that even says that in footnote 1 that the board says, we observed that the transcript reflects that some of the testimony of the respondent on cross-examination may be missing. Yes. Yes, Your Honor. And I wanted to point out very quickly about this remand issue, and then I'd like to get into the substance. The remand, this Court's decision in Fernandez, what the board did in this case is okay under Fernandez, because Fernandez says that unless and until the board limits the scope of the remand, we're going to assume that it hasn't limited the scope of the remand, essentially. The board in this case did limit the scope of the remand because it was required to under this Court's then-President Melino Camacho, which has since been overturned by Lolong. Had Lolong existed at that time, the board wouldn't have even remanded. It just would have been before this Court, and the board would have issued the order of removal. That being said, even if the board's decision conflicts with this Court's decision in Fernandez because the board is not allowed to limit the I.J. in such a manner, this Court has pointed out today that the I.J. on remand, this is on page 55, asked the parties, is there anything that you'd like to raise at this time? So the I.J. sort of violated the board's limited remand order, in a sense, and gave the parties that opportunity regardless, and they waived it, as Your Honor has pointed out. So this Court should not be concerned in this case that there is any violation of Fernandez. Whether or not it applies is questionable also because Fernandez addresses a open-ended remand. But if it does apply, it complies with Fernandez. Now I'd like to get into the merits of the claim in terms of why the record does not compel reversal of the board's decision. And actually I'd like to point out the difference between the board's decision and the I.J.'s decision in terms of why the board could have come out the other way. If you look on page 638, that's where the I.J. is sort of giving most of his analysis as to why he grants deferral of removal. And he basically sums it up as, because of the nature of the respondent's political activity, the nature of the area where he was living and engaging in this activity, and the incident that he's testified to, the 1981 incident, coupled with a reading of the country report and the conditions in Guatemala, the Court finds a grant of deferral of removal as merited. Now a couple things are missing from this analysis. First of all, there's no cite to the burden of proof here, even though he mentions it earlier. He's not talking about the more likely than not standard at this particular point. He mentions it earlier. But the biggest thing that's missing, and what Your Honor has pointed out, is the testimony relating to his return trips to Guatemala twice and the fact that he stated that he would live in the capital and he believed he would be safe there. Now under 1208.16C3 double little I, the board is entitled to look at evidence that he could relocate to a part of Guatemala where he is not likely to be tortured. This is part of the regulation that goes into the inquiry of the CAT analysis. Now in this case, the board didn't find a fact that the IJ didn't find. That's not what happened here. The IJ found that fact. The IJ didn't incorporate those facts into his legal analysis. And that is the key point. And I understand that this Court does not allow the board, and the board cannot make findings of fact. And that's usually the problem why when the board, I see that my time is running out and I just want to finish this point. Usually the problem when the board overturns an IJ's decision is that the board has to somehow find a finding of fact that the IJ didn't find. The board overlooks evidence. The board does something wrong with the facts. And that's not allowed. In this case, that's not what happened. The board took the standard, the legal standard, and the legal criteria for evaluating CAT, and applied the law to the undisputed facts. So the board came out differently from the IJ, largely because if you look at the board's decision, the board specifically notes those two key things. He said he could safely relocate. He said he's returned twice, especially during the war in Guatemala, when it was arguably much more dangerous at that point than it is today, and suffered no problem while he was there. His other evidence about the likelihood of future harm is speculative, because as you pointed out just now today, he's not offering concrete evidence about why general violations of human rights there actually shows more likely than not that he would be tortured by or with the acquiescence of the government, considering the incident he suffered was in 1981. I have one final question. Yes. You come from Washington? Yes, Your Honor. Who do you work for back there? The Department of Justice. Yes, but I mean what part of the Department of Justice? Civil Division, Office of Immigration Litigation. I know that my time is up. I just want to remind the Court the standard of review is whether the record compels reversal. You might disagree with the board's decision. The board disagreed with the IJ's decision. That's okay. The issue now is whether the record compels reversal of what the board found applying all of the legal criteria, that he can safely relocate there, and that is clearly something that would defeat his claim for deferral of removal. All right. Thank you, counsel. Thank you. Do you want a minute to respond? I don't have a minute. Well, do you have a point you want to make? You looked like you were half way, so. No, yes, Your Honor. I just want to make a couple points real quickly, and in particular referring to the board's order of 2006. In part of the reasoning for the reversal of the IJ's decision, they say that although the respondent may subjectively fear harm from Vidal or his former attackers, there is no showing that these individuals, aside from Vidal, are even alive or that any of them would act on behalf of the current government or would act against this. This is a dangerous, slippery slope we're talking about here, because basically what the board is doing is engaging in this type of speculation and creating a standard where the respondent or the asylum seeker somehow, someway is going to have to be able to prove that certain people are still alive. Well, I think the problem actually with this, with your case, and first of all, you're obviously not the lawyer who represented your client below, and so there are opportunities to do things to improve your client's position before us that were not undertaken. But secondly, there's a real problem with the individualized showing that it is more likely than not that Mr. Carrara-Varula would be tortured under these circumstances, and I think that's what we have to look at. Well, I would request that the court also review whether or not any court, including the board, should be setting that type of a standard where an asylee has to prove that his prior, the persons that harmed him before, are now still alive. I think that's the sort of thing. The board didn't say that. It just said there's an absence of any evidence to that effect in this case. Well, I think that's almost just an atmospheric. Well, I would disagree that I think it was part and parcel to part of the reasoning. With that, I'll submit no. All right. Thank you, counsel. Carrara-Varula v. Hulger is submitted. Biger v. Pickman is submitted on briefs. United States v. Rodriguez.
judges: Trott, Wardlaw, Ikuta